**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
PAUL MEYER,

                              **Plaintiff,**

              **-against-**

NANCY BERRYHILL, Acting Commissioner of
Social Security,

                           **Defendant.**
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/28/2018

**17-CV-05075 (SN)**

<u>**OPINION AND ORDER**</u>

**SARAH NETBURN, United States Magistrate Judge:**

Paul Meyer seeks judicial review of the Commissioner of Social Security's denial of his application for disability insurance benefits under the Social Security Act (the "Act"). 42 U.S.C. § 405(g). Meyer claims that his impairments prevent him from working in any capacity. These impairments include status-post left hemilaminectomy, lumbrosacral disc herniation with mild canal stenosis, post-laminectomy syndrome, thoracic and lumbar spine neuritis, obesity, chronic pain syndrome, and left hip pain.

An Administrative Law Judge ("ALJ") determined that the medical evidence did not support Meyer's account of the severity of his symptoms. The ALJ gave little weight to various treating sources' opinions regarding his back, finding that the medical record ultimately did not support all of their conclusions. He gave some weight to the opinion of consultative examiners who found that the plaintiff is capable of sedentary work. The ALJ found that Meyer no longer retained the capacity to work as a police officer, but sufficient jobs existed in the national economy that he could perform.

The parties each move for judgment on the pleadings, and the Court GRANTS the Commissioner's motion.

**BACKGROUND**

**I.      The Administrative Record**

On November 4, 2013, Meyer filed a Title II application for disability insurance benefits. See 20 C.F.R. § 404. On January 3, 2014, the agency denied his application, and Meyer requested a hearing. On December 11, 2015, Meyer appeared with counsel at a hearing before ALJ Robert Gonzalez. On January 29, 2016, the ALJ issued a decision, finding that Meyer was not disabled. This decision became final when the Appeals Council denied review on December 23, 2016.

**A.      Plaintiff's Initial Statements to the Social Security Administration**

In his initial application documents, Meyer alleged that he was disabled due to a back injury. AR 189. On November 27, 2013, Meyer submitted a function report to the SSA. AR 198-206. Meyer stated that his daily activities include feeding his cat and dog, walking his son down the driveway to the bus, doing a few light household chores, and watching television. AR 199. He does not take care of anyone else except for his pets. AR 199. Before becoming disabled, he could work, exercise, run, hunt, and fish. AR 199. His injury causes him to wake up in the night and allows him four hours of sleep. AR 199. Due to back pain, he has trouble putting on his shoes and bathing. AR 199. He prepares "simple things" for breakfast and lunch, relying on his wife for the main meals. AR 200-01. He does not do outside chores and is restricted to simple tasks like putting dishes in the dishwasher and wiping down the kitchen counter. AR 200. He needs help with major household chores like cleaning and laundry. AR 200. His restricted ability to perform these tasks is due to back pain and recovery from surgeries in June and November of

that year. AR 200. He goes outside on a daily basis. AR 200. He indicated that he could not drive "yet" following his surgery of two weeks prior. AR 200.

Meyer wrote that he shops in stores for milk, bread, and eggs—but not since his recent surgery. AR 202. He can no longer do any of his hobbies, any outside chores, or yardwork. AR 202. He only spends time with his family and has not traveled since his June 2013 surgery. AR 203. He visits the doctor on a monthly basis and goes to physical therapy on a weekly basis. AR 203. He stated that he could sit only about 20 minutes and stand or walk around for 30 minutes before needing to lie down. AR 204. He explained that since his surgery, he could not be in any position for too long. AR 204. He can use his hands as long as he does not lift anything heavy and can see, hear, and talk without issue. AR 204. He stated that he could walk approximately one block before needing to stop and rest. AR 205. He stated that due to pain and poor sleep he has had a hard time with focus and concentration. AR 205. He further stated that stress can affect his pain and sleep. AR 206.

### B. Medical History

#### 1. Treating Sources

##### a) Dr. Christopher Inzerillo

On January 9, 2013 (before the alleged disability onset date), Meyer presented to Dr. Inzerillo with left hip pain shortly following an incident at work. AR 276, 278. Meyer reported dull pain in his left hip that was not relieved by anything and that worsened with walking. AR 276. Upon examination, Dr. Inzerillo assessed a full range of motion in his left hip without pain, negative impingement, negative trochanteric tenderness, and pain in the gluteal area. AR 277. Dr. Inzerillo recommended continued home exercise, stretching, and physical therapy. AR 277.

On March 14, 2013, Meyer presented to Dr. Inzerillo with left hip pain. AR 274. He stated that his pain worsened with sitting and that he experienced relief with nonsteroidal anti-inflammatory drugs. AR 274. Upon examination, Dr. Inzerillo noted that his left hip had the full range of motion without pain, with negative impingement sign and negative trochanteric tenderness. AR 275. Dr. Inzerillo recommended physical therapy for sciatic nerve irritation. AR 275.

### b) Physical Therapist Douglas Abplanalp

Before the alleged disability onset date of March 12, 2013, Meyer injured his left hip at work while subduing a criminal suspect. AR 274. After an initial visit, PT Abplanalp began to treat Meyer. AR 346-48. On March 22, 2013, reported that his pain ranged from a 2/10 to a 10/10. AR 445. Meyer described his pain as a sharp, stabbing, shooting pain in the left lumbar spine and hip with radicular symptoms going down into the knee. AR 445. He reported that his best time for the pain is the evening and worst is the morning, and that he lost three hours of sleep per night due to the pain. AR 445. PT Abplanalp reported that Meyer presented with symptoms consistent with lumbar radiculopathy, lower back pain, decreased lumbar range of motion, palpable tenderness, decreased trunk and lower extremity strength, and decreased functional mobility. AR 446. He assessed Meyer's prognosis as good and that Meyer was motivated to comply with the treatment plan. AR 446. He noted that Meyer was in good health upon departing the clinic with no obvious signs of distress. AR 446.

As PT Abplanalp continued to treat Meyer, he noted improved range of motion and less pain as compared to the initial visit. See, e.g., AR 436, 433. During his visits from March to May 2013, Meyer reported feeling sore and significant pain, though it could fluctuate from day to day. AR 349-446. He often noted that the car ride increased his pain. AR 316, 393, 395, 407. He

occasionally noted having good days and bad days. AR 380. Otherwise, PT Abplanalp's findings and Meyer's self-reported pain and soreness remained the same.

During a September 9, 2013 lower back re-evaluation, PT Abplanalp noted that Meyer had not progressed since his July 22, 2013 evaluation other than being able to wash and dress independently with the usual technique, as limited by pain, and some slight improvement in his homemaking activities. AR 343-44. His functional assessment improved from a Modified Oswestry Low Back Pain Disability score of 70 to 64. Again, PT Abplanalp noted that Meyer had improved in hip flexion, hip extension, knee flexion, knee extension, dorsiflexion, and great toe extension from poor to fair in his left lower extremity, but had remained fair in his right. AR 344.

### c)      Dr. George Jones

On May 3, 2013, Dr. Jones, a neurosurgeon, examined Meyer. AR 523-25. Meyer presented with pain in the left upper buttock radiating to the lower buttock, with occasional pain radiating down the leg to the lateral aspect of the ankle, without change in symptoms since his March injury. AR 523. Meyer told Dr. Jones that his symptoms were worsened by sitting for too long. AR 523. Upon examination, Dr. Jones noted that Meyer was normal other than a positive straight leg test of the left. AR 524. Dr. Jones assessed Meyer with a left upper buttock and leg pain most consistent with lumbar radiculopathy. AR 524. Dr. Jones thought that surgery was not necessary at the time. AR 524. On June 11, 2013, after reviewing an MRI and noting that Meyer's pain remained after a steroid injection, Dr. Jones scheduled a left L4-5 microlaminectomy and discectomy. AR 521.

On June 20, 2013, Meyer underwent surgery, which included L4 subtotal inferior hemilaminectomy, L5 total superior hemilaminectomy, left L4-5 medial facetectomy, and left L4

and L5 foraminotomies. AR 518-520. After the surgery, Dr. Jones diagnosed Meyer with left L4-5 facet arthropathy and disc osteophyte complex with spinal stenosis and medically intractable radiculopathy. AR 518. Dr. Jones did not perform a discectomy because there was no significant ventral compression. AR 519. On July 9, 2018, Dr. Jones noted that Meyer was doing well overall and that his pain had improved from a 6/10 to a 3/10. AR 516. He referred Meyer to physical therapy to help him return to physical activities and to a primary care physician to help with his alcohol intake. AR 516. Dr. Jones noted that Meyer ran out of Percocet and got by without it for several days. AR 516. On August 6, 2013, Meyer saw Dr. Jones for another postoperative follow-up from his June surgery. AR 514-15. Dr. Jones noted that Meyer continued to make good progress and that his pain level had improved significantly compared to before the operation, though Meyer continued to complain of pain deep in his left buttock. AR 514. Dr. Jones recommended that Meyer remain out of work for the time being. AR 514. On September 17, 2013, Meyer reported that his pain levels were significantly better than when compared to the operation, though he still had some discomfort. AR 512. He recently began to feel numbness and tingling in the left anterior leg. AR 512. He also reported stopping all pain medication and alcohol. AR 512. Meyer stopped physical therapy because his progress plateaued. AR 512.

An October 10, 2013 MRI showed status post L4 to L5 left hemilaminectomy with minimal broad-based left paracentral disc protrusion and minimal central canal stenosis as well as mild L4 to L5 and L5 to S1 degenerative disc disease. AR 509-10. An x-ray of the same date showed minimal multilevel lumbar spondylosis. AR 511. On October 22, 2013, Dr. Jones again saw Meyer and noted that he had not seriously improved. AR 508. He scheduled a second L4-5 exploration with microdiskectomy and foraminotomies. AR 508. On November 14, 2013, Dr.

Jones performed a left L4-5 intralaminar re-exploration, a left L4-5 diskectomy, a left L4 subtotal inferior hemilaminectomy, a left subtotal superior hemilaminectomy, and a left L4-5 medial facetectomy. AR 504. Dr. Jones diagnosed recurrent left L4-5 herniated nucleus pulposus with spinal stenosis and medically intractable radiculopathy. AR 504. On December 27, 2013, Dr. Jones noted that Meyer reported that his left upper buttock and leg radicular pain had "almost completely resolved." AR 502.

On February 21, 2014, Dr. Jones noted very good progress following the November operation with some continued back pain. AR 500. He stated that Meyer could stand on his toes and heels without difficulty. AR 500. Dr. Jones was "optimistic" that Meyer would be able to return to full-duty work as a state trooper. AR 500. On April 25, 2014, Dr. Jones noted that he had made a "marked improvement" but that he is unable to return to work as a state trooper without restriction. AR 495. Dr. Jones noted that he would "support his application" for disability. AR 495. On September 9, 2014, Dr. Jones noted that he could do nothing else for Meyer and that Meyer indicated that he was looking at other career options. AR 593.

In January and February 2015, Dr. Jones noted that Meyer had more serious back pain than leg pain. AR 730. An MRI showed no evidence of residual or recurrent disc herniation. AR 730. Dr. Jones wanted to defer any further surgery because his low back pain had only become prominent recently and because of "red flags" that led him to believe that Meyer may be seeking additional treatment because of his upcoming disability determination. AR 730. He also noted that Meyer had ceased physical therapy a year before and referred him back. AR 730.

On December 23, 2014, Dr. Jones filled out an impairment questionnaire (the authenticity of which the ALJ has doubts). AR 579-82. Dr. Jones stated that Meyer had lower back and left extremity pain, weakness, and numbness and that his prognosis was poor. AR 579. For clinical

findings, Dr. Jones identified decreased sensation in the lower left extremity. AR 579. Otherwise, Dr. Jones identified exactly the same limitations as Dr. Perri, listed below. On November 6, 2015, the ALJ asked Dr. Jones a number of clarifying questions, which he declined to answer because "we are not worker's comp doctors, will not fill out form, we will send office notes (attached)." AR 721-25.

### d) Dr. Daniel Perri

On May 16, 2013, Meyer saw Dr. Perri, a physiatrist. AR 460. Meyer complained of lower back pain with radiation to and weakness in his left leg. AR 459. On May 21, 2013, Dr. Perri gave Meyer a steroidal injection and performed an electromyography, which revealed acute left L5 radiculopathy and chronic right peroneal neuropathy. AR 453, 458. Dr. Perri noted that Meyer could not return to work because of his pain and inability to restrain criminals, and had limitations on his bending, lifting, sitting, climbing stairs/ladders, and standing. AR 461. On May 22, 2013, Dr. Perri administered an L5-S1 interlaminar epidural steroid injection. AR 453.

On September 24, 2013, Dr. Perri, on reference from Dr. Jones, performed an EMG to assess whether Meyer suffered from radiculopathy. AR 458-61. The electrodiagnostic studies revealed that Meyer had acute and chronic left L4 through S1 radiculopathies and a chronic right peroneal neuropathy. AR 448-49.

On March 26, 2014, Dr. Perri examined Meyer. AR 568-70. He noted that Meyer presented with back pain, left buttock pain, and numbness in the left lower extremity from the mid-thigh distally. AR 568. He noted that left straight leg raising is positive. AR 569. He assessed neuritis or radiculitis and postlaminectomy syndrome in the lumbar region. AR 569. Upon examination, Dr. Perri noted normal findings except for mild discomfort, a slightly antalgic gait, limited range of motion, and positive straight leg raising. Over the next several

months, Dr. Perri continued to see Meyer. He noted few changes and kept him on the same course of medication. AR 559-69. For the rest of the year, Dr. Perri made largely the same findings. AR 559, 629, 712, 715, 556-57, 632, 709. In July, Dr. Perri noted that Meyer reported trouble sitting for more than 20 minutes at a time. AR 709, 712. In October and December, Meyer told Dr. Perri that the medications helped but that he stopped taking them and that tramadol caused agitation and anger. AR 550-55, 635-55.

In 2015, Meyer told Dr. Perri that he had 5-7/10 lower back pain with numbness and mild weakness in his left leg, but exams were unchanged. AR 641-45, 673, 676, 679, 682, 685, 688, 697, 700. Dr. Perri's findings remained largely the same for the rest of the year. Dr. Perri referred Meyer to Dr. Hussein regarding a spinal cord stimulator because his pain medication was largely not working. AR 695-98. Meyer told Dr. Perri that the stimulator did not work and was annoying. AR 688, 691.

On December 18, 2014, Dr. Perri completed a questionnaire about Meyer's impairments. AR 571-74. Dr. Perri stated that he had seen Meyer eight times for post lumbar laminectomy syndrome and that his prognosis was poor. AR 571. As symptoms, Dr. Perri listed lower back pain, left leg pain, weakness, and numbness. AR 571. Dr. Perri explained that Meyer's leg pain was severe and constant, and worsened with sitting and activities. AR 571. Dr. Perri opined that Meyer could walk four blocks without rest or severe pain. AR 572. He further opined that Meyer could sit or stand for 20 minutes at a time, and sit for fewer than 2 hours total in a working day and stand/walk for at most 4 hours in a working day. AR 572. He stated that Meyer needed a job that permitted shifting positions at will from sitting, standing, or walking, and that any job would require periods of unscheduled walking around. AR 572. He opined that Meyer would need to take 30-minute unscheduled breaks during the workday on a daily basis due to muscle weakness

and pain. AR 572. Dr. Perri opined that Meyer could occasionally lift up to 10 pounds and rarely lift up to 20 pounds. AR 573. He further opined that Meyer could never twist or climb ladders, and rarely stoop, crouch or squat, or climb stairs. AR 573. He opined that Meyer's symptoms would keep him off task 10% of the time and that he would be absent from work two days per month. AR 574.

On November 5, 2015, Dr. Perri completed another impairment questionnaire identifying symptoms of constant, 6/10 lower back pain, left buttock/hip pain, and left leg weakness and numbness, and identifying supporting clinical findings of positive straight leg raising, slightly antalgic gait, and decreased sensation in the left leg. AR 749. He opined that Meyer could walk one city block without rest or severe pain, could sit or stand for 20 minutes at a time, could sit for four hours and could stand/walk for two hours in an eight-hour day. AR 750. He further opined that Meyer needed a job that permitted shifting positions at will and periods of walking around during an eight-hour day. AR 750. He stated that Meyer needed to walk around 15 times per day for 10 minutes at a time and that Meyer needed to take 15-minute unscheduled breaks three times per work day, caused by pain and numbness. AR 750. Dr. Perri opined that Meyer could frequently lift and carry up to 10 pounds, occasionally 10 pounds, rarely 20 pounds, and never 50 pounds. AR 751. He stated that Meyer could occasionally twist, rarely stoop, rarely crouch/squat, never climb stairs, or ladders. AR 751. He opined that Meyer would be off task 20% of the time. AR 751.

On November 6, 2015, Dr. Perri completed a series of follow-up questions from the ALJ. AR 738-41. Dr. Perri stated that he had many years of expertise in New York State disability evaluations. AR 738. Dr. Perri further explained that he asked Meyer to perform all of the movements for which he had identified a limitation. AR 739. He explained that each time or

weight limitation in his opinion came from discussions with Meyer and his own observations. AR 740. He further clarified that all the limitations were based on some degree to Meyer's reports, to which he "attached significant weight." AR 740. Meyer paid Dr. Perri $250 for producing his report. AR 740.

### e) Dr. Seth Neubardt

On October 28, 2013, Meyer presented to Dr. Neubardt with complaints of low back pain with radiation into the left leg. AR 462. He told Dr. Neubardt that he tried physical therapy and an epidural injection without improvement. AR 462. An operation improved his pain level, but he continued to experience pain. AR 462. Meyer reported that his left leg would buckle and had a sensation of weakness. AR 462. Upon examination, Dr. Neubardt made largely normal findings, except for a limited range of motion and a positive straight leg test on the left side. AR 462. Dr. Neubardt noted that the MRI showed a small broad-based disc bulge but no definite neural impingement. AR 462. Dr. Neubardt wrote that it was not clear what was causing Meyer's symptoms. AR 462-63.

### f) Chiropractor Howard Salob

On July 31, 2014, Meyer saw Howard Salob, a chiropractor. AR 545. Meyer presented with constant lower back pain and stiffness, rated as an 8/10 on a pain scale with constant radiation into the right hip and the right leg down to the foot. AR 545. He complained of pain in his right hip and leg with a pin and needle sensation occurring constantly. AR 545. He complained of being unable to sit or stand because of the pain. AR 545. Upon examination, Salob noted a positive Lasegue test bilaterally and a positive Braggard's sign on the right. AR 546. The Kemp's test was positive on the left. AR 547. After palpation, Salob noted spasms and tenderness as well as hypersensitive hard nodules. AR 547. Salob diagnosed lumbar subluxation.

AR 547. His prognosis indicated that it was possible that Meyer's condition was permanent and that his activities of daily living were severely limited due to his symptoms. AR 548. Subsequent consultations with Salob revealed largely the same findings. 526-28, 535-55.

On December 22, 2014, Salob completed a questionnaire for Meyer. AR 575-78. He stated that he had seen Meyer for six months for a lower back condition and that his prognosis was fair. AR 575. He noted that physical therapy and chiropractic techniques had produced fair, but not long-lasting, results. AR 575. He noted that anxiety worsened Meyer's symptoms. AR 576. Salob opined that Meyer could walk two blocks without resting, sit for fifteen minutes without getting up and stand or walk for fifteen minutes without changing position. AR 576. He opined that Meyer needed to take unscheduled 20-minute breaks on a daily basis. AR 576. He further opined that Meyer could occasionally lift or carry up to ten pounds, but never more. AR 577. He indicated that Meyer could never twist or climb ladders, and only rarely stoop, crouch/squat, or climb stairs and that Meyer would be off task 10% of the time and absent from work three days per month. AR 577-78.

### g)      Dr. Omar Hussein

On April 16, 2015, Dr. Hussein, a pain management physician, met with Meyer for treatment of lower back pain radiating to the lower extremity. AR 598. Meyer presented with dysesthesias, muscle pain, leg pain, decreased range of motion, and numbness and tingling. AR 598. Meyer reported a 7/10 on the pain scale during his consultation with Dr. Hussein. AR 599. Upon examination, Meyer was normal except for decreased range of motion, cross straight leg raising, paraspinous muscle spasm, tenderness, trigger points, positive iliac gapping factor, and positive Patrick's test. AR 599. Dr. Hussein diagnosed degeneration of the lumbar or lumbosacral intervertebral disc, thoracic or lumbosacral neuritis or radiculitis, sacroiliac sprain,

and postlaminectomy syndrome of the lumbar region. AR 600. Dr. Hussein recommended that
Meyer increase his daily activity as tolerated, but avoid sitting for long periods and excessive
neck bending. AR 601. On April 21, 2015, Dr. Hussein applied a spinal cord stimulator. AR 597.
On April 23, 2018, Dr. Hussein removed the stimulator, noting that the range of motion had not
improved by 50% and that there was tenderness in the paraspinal muscles and facet joints. AR
595. There were no spasms, change in sensory or motor function, and intact reflexes. AR 595.

### 2. Other Medical Evidence in the Record

On April 16, 2013, Meyer underwent a lumbar MRI, which showed mild retrolisthesis,
small central disc herniation at L-4 to L-5 and at L-5 to S-1 causing mild canal stenosis, no
significant neural foraminal narrowing, and straightening of lumbar lordosis. AR 280.

### C. Consulting Physicians

### 1. Dr. Gilbert Jenouri

On December 20, 2013, Meyer saw Dr. Jenouri, an orthopedist, on referral from the state
disability authorities. AR 492. Meyer reported 2/10 back pain. AR 492. Meyer reported cooking
two to three times per week, cleaning twice weekly, and doing laundry once a week. AR 492. Dr.
Jenouri noted that Meyer had a normal gait, that he could walk on his heels and toes without
difficulty, and needed no assistance getting on or off the examination table, but that Meyer was
only able to squat 50%. AR 493. His cervical spine and upper extremities showed no concerns.
AR 493. His thoracic and lumbar spine and hip had limited flexion and extension, and he had a
positive straight leg raising on the left leg and decreased left leg sensation. AR 493-94. Dr.
Jenouri diagnosed lower back pain, left lower extremity paresthesia, and a history of emotional
asthma. AR 494. He opined that Meyer was mildly restricted in walking, standing, and sitting for

long periods, as well as bending, climbing stairs, lifting, and carrying. AR 494. He also suggested that Meyer avoid smoke, dust, and other respiratory irritants. AR 494.

### 2. Dr. Paul Jones[1]

On August 7, 2013, IME Jones, an orthopedist, examined Meyer for his disability retirement claim. AR 587. Physical examination revealed that Meyer could walk on his heels and toes, tilting and twisting were normal, range of motion was limited, left sciatic notch was tender to palpation, and that reflexes and sensation are normal. AR 588. IME Jones opined that Meyer could only do sedentary work with no bending, lifting, or reaching. AR 589.

### 3. Dr. Govindlal Bhanusali

On September 25, 2014, Dr. Bhanusali, an orthopedist, examined Meyer for his worker's compensation claim. AR 742. Meyer drove himself to the exam. AR 742. He complained of numbness, pain in the lumbosacral spine, variable pain between 3/10 and 5/10, and spasms. AR 743. Meyer told Dr. Bhansuli that he could not "sit for more than 20 minutes, run, twist, bend, etc." AR 743. He also told Dr. Bhansuli that he planned to retire after November 2014, but that "[h]e feels he can do modified work with some limitation." AR 742. Upon examination, Dr. Bhanusali noted that Meyer had mild tenderness and positive straight leg raising bilaterally. AR 745-46. Dr. Bhanusali noted tenderness, but full range of motion except for lumbar flexion and a halfway squat. AR 746. Dr. Bhanunsali opined that Meyer had a partial marked 75% temporary disability. AR 747. He further opined that Meyer can do modified work with limitations to lifting up to 5 pounds and avoiding bending, pushing, pulling, and strenuous physical activities and that Meyer had not reached his maximum medical improvement. AR 747. On December 22, 2014, Dr. Bhanusali made similar findings. AR 664-66.

---

[1] Referred to as IME Jones to avoid confusion with Dr. George Jones.

On April 30, 2015, Dr. Bhanusali again examined Meyer, who was driven to the appointment by his wife. AR 659. He did not walk with a limp and complained of 5/10 to 7/10 pain. AR 659-60. The examination had the same results as the earlier evaluations. AR 660-62. Dr. Bhanusali opined that Meyer could "do modified work with limitations of not to lift more than 5 to 10 pound weight, and avoiding bending, pushing, pulling, squatting, and strenuous physical activities." AR 662. His pain level was 5 of 10, sometimes going up to 7 of 10. AR 653. Meyer told Dr. Bhanusali that he "cannot bend, twist, turn, sit more than 30 minutes, stand more than 1 hour, walk more than 1 hour." AR 653. Dr. Bhanusali's exam was largely unchanged, as was his medical opinion. AR 656. Dr. Bhanusali completed another questionnaire stating Meyer could occasionally lift, carry, pull, and push up to five pounds. AR 657. He further noted that Meyer could occasionally stand, walk, climb, kneel, and operate machinery, and frequently simply grasp, finely manipulate, reach overhead, reach at/or below shoulder level, and drive a vehicle. AR 657. Dr. Bhanusali concluded that Meyer was limited to sedentary work, which involves sitting most of the time, but may involve walking or standing for brief periods of time. AR 657.

### D.    The ALJ Hearing

At the December 11, 2015 hearing before ALJ Gonzalez, Meyer appeared represented by counsel. AR 38. Meyer testified that he worked for the state police for 18 years, stopping after injuring himself while arresting a suspect. AR 43. He explained that he underwent two surgeries to correct the damage done to his lumbar spine. AR 44. He stated that the surgery reduced his pain level from 8/10 (with spikes to 10/10) to 5 or 6/10 (with spikes to 7/10 or 8/10). AR 44. He testified that he takes hydrocodone four to five times daily, which makes him tired and disoriented. AR 45. He stated that his wife drove him to the hearing and to his appointments with

Dr. Perri. AR 46. He explained that his previous job as a state trooper required him to patrol and respond to incidents. AR 48. He testified that he had tried running, but could not make it more than five steps. AR 52. Instead, he walks two or three blocks multiple times per week, but not every day due to his back pain. AR 52. He stated that he exercises using free weights of up to ten pounds in his home gym doing a yoga routine. AR 54. He tries to go on the treadmill for ten minutes at a time. AR 55. The only vacation he took since the alleged onset date was a drive down to Virginia in August 2015. AR 56. He stated that he could not do light-duty work as an officer because he would have to drive with pain medication. AR 58. He explained that the injections and spinal cord stimulator did not help his pain. AR 59-60. He testified that he could sit for 20 minutes and stand or walk for 30 to 45 minutes and he could bend a little bit and squat a portion of the way down. AR 60, 63.

Meyer explained that he was originally planning to enter the foreclosure business with his wife after retiring from the state police but could not due to his medical condition. AR 64. The ALJ asked Meyer about comments in Dr. Jones's file that the ALJ believed to be inconsistent with Meyer's earlier testimony. AR 67-69. Meyer explained that Dr. Jones's reference to weightlifting and walking referenced Meyer's lifting yoga weights and pacing around his house, respectively. AR 70. He stated that his wife would drive him to a track, where he would walk three-fourths of a mile. AR 70-71.

Upon examination from his attorney, Meyer stated that he gets three to four hours of sleep and then has trouble for the rest of the night but that he naps during the day. AR 72. He further testified that he takes Ambien, Cymbalta, hydrocodone, and oxycodone. AR 73. He helps his wife fold laundry and helps with dishes "for a little bit." AR 73. He does not do any outside chores. AR 73. He also testified that he used a computer and the Internet at work. AR 76-77.

The ALJ solicited testimony from Michele Erbacher, an impartial vocational expert. AR 75-80. The ALJ asked her whether a hypothetical person with Meyer's background who could perform the full range of sedentary work, with only the occasional ability to push and pull, stoop, crouch, and climb stairs could perform Meyer's previous work as a state trooper. AR 78. The vocational expert responded in the negative. AR 78. She went on to testify that such an individual could still perform certain jobs in the national economy, such as tube operator, call-out operator, order clerk, or ticket checker. AR 78. She further explained that no jobs would exist if this individual were off task for 20% of the workday. AR 79. Nor would there be any jobs for the same individual who would need to nap for one to two hours daily and be absent from work four days a month. AR 79.

## II.     The ALJ Decision

In a February 3, 2016 decision, the ALJ found that Meyer had not engaged in substantial gainful activity since the alleged onset date of March 12, 2013. AR 15. The ALJ found that Meyer suffered from six severe impairments as defined in 20 C.F.R. § 404.1520(c): status-post left hemilaminectomy; lumbosacral disc herniation with mild canal stenosis; post-laminectomy syndrome; thoracic and lumbar spine stenosis; obesity, chronic pain syndrome; and left hip pain. AR 15. The ALJ determined that none of Meyer's mental impairments was severe.

At step three of the analysis, the ALJ found that the impairments did not meet or equal the severity of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 17. The ALJ gave special consideration to listings 1.02 (major dysfunction of a joint), 1.04 (disorder of the spine), and 12.04 (affective disorders). AR 17. The ALJ also considered Social Security Ruling 02-01p regarding obesity. AR 17.

The ALJ found that Meyer had the Residual Functional Capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that he could only occasionally push/pull, stoop, crouch, climb stairs, and could never climb ladders/ropes/scaffolds or operate motor vehicles. AR 17. To reach this conclusion, the ALJ considered objective medical evidence and opinion evidence. AR 17-27. The ALJ found that Meyer's impairments could cause his symptoms, but he did not find Meyer's statements about the intensity, persistence, and limiting effects of the symptoms credible. AR 18. The ALJ found that Meyer's testimony about his daily activities showed that he was able to perform work consistent with the ALJ's determination of the RFC. AR 18. The ALJ's review of the medical record found scant evidence of Meyer's alleged hip condition, and that his low back condition did not mean that he was totally disabled. AR 19. The ALJ found that Meyer's testimony was not credible because of his described daily activities, his treatment regimen has been routine and conservative, the opinions of the treating physicians were not based on medical evidence, there were questions about whether Meyer wanted to pursue sedentary work, and he showed no debilitating symptoms during the hearing. AR 24.

The ALJ assigned little weight to the opinion of Dr. Perri because he relied heavily on Meyer's self-reporting, was paid to write the medical source statement, and his opinions were not consistent with the medical record. AR 25. The ALJ assigned chiropractor Salob's opinion very little weight because he is not an accepted medical source and his opinion was not supported by medical evidence and was inconsistent with the record as a whole. AR 25. The ALJ assigned Dr. Jenouri's opinion some weight because it was consistent with his findings and the medical record. AR 25. He assigned Dr. Jones's opinion from the treatment notes limited weight because he did not provide "a function-by-function analysis." AR 25. He assigned Dr. Jones's medical

source statement little weight because it was not supported by the treatment notes and because the ALJ had doubts as to its authenticity. AR 26. The ALJ assigned IME Jones's opinion only some weight because its more severe limitations were contradicted by the medical record. AR 26. He assigned Dr. Hussein's opinion little weight because it did not include any appreciable functional limitations. AR 26. The ALJ assigned portions of Dr. Bhanusali's September 2014 opinion some and little weight depending on their record support, but assigned his September 2015 opinion great weight except the portions that were not supported in the record. AR 26-27.

At step four, the ALJ found that Meyer could no longer perform his past work. AR 27. At step five, the ALJ found that jobs existed in significant numbers in the national economy that Meyer could perform. AR 27-28. The ALJ concluded that Meyer was not disabled. AR 28.

## DISCUSSION

### I.      Standard of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The ALJ's disability determination may be set aside if it is not supported by substantial evidence. See Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Pursuant to 42 U.S.C. § 405(g),

however, the factual findings of the Commissioner are conclusive when they are supported by substantial evidence. See Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980). The substantial evidence standard is "a very deferential standard of review – even more so than the clearly erroneous standard." Brault v. Comm'r of Soc. Sec., 683 F.3d 443, 448 (2d Cir. 2012). "[O]nce an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Brault, 683 F.3d at 448 (internal quotation marks and emphasis omitted).

## II.     Definition of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(2)(D). A claimant will be determined to be disabled only if the impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(2)(B).

The Social Security Administration has established a five-step sequential evaluation process for making disability determinations. See 20 C.F.R. § 404.1520(a)(4). The steps are followed in sequential order. If it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals has described the process as follows:

First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1 [ (the "Listings") ] . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform his past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). "The Social Security regulations define residual functional capacity as the most the claimant can still do in a work setting despite the limitations imposed by [her] impairments." Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013). "The claimant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last." Selian, 708 F.3d at 418.

## III.    Analysis of the ALJ's Decision

Meyer argues that the ALJ erred by finding that he retained an RFC for sedentary work because he failed to make findings as to Meyer's need to alternate between sitting and standing. He further argues that the ALJ erred by discounting Meyer's credibility and in applying the treating physician rule correctly.

### A.    Function-by-Function Analysis

Meyer argues that the ALJ erred by failing to assess whether Meyer's need to alternate between sitting and standing eroded his RFC for sedentary work. "Before an ALJ classifies a claimant's RFC based on exertional levels of work (i.e., whether the claimant can perform sedentary, light, medium, heavy, or very heavy work), he 'must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and

416.945.'" Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (quoting SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996)). While an ALJ needed not perform "an explicit function-by-function analysis . . . [r]emand may be appropriate, however, where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. at 177.

The ALJ here conducted a thorough review of the record that included Meyer's ability to sit and stand. He declined to assign either treating physician controlling weight and further declined to credit the portions of the opinions provided by Dr. Bhanusali and IME Jones that discuss Meyer's sitting limitations. AR 26, 27 ("Also limiting sitting to only occasionally is not well supported by substantial evidence in the case and it is given little weight."). On the other hand, the ALJ discussed Meyer's activities of daily living and considered the objective medical evidence on the topic, which he found to indicate that Meyer did not have any limitation on his ability to sit or stand. He further discussed consultative examiner Dr. Jenouri's assessment, which also supports the RFC. Meyer argues that Dr. Jenouri's opinion is too vague because he simply describes Meyer's sitting limitation as mild, but Dr. Jenouri also "provided additional clarifying information," Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 34 (2d Cir. 2013) in the form of results from clinical tests that also support the RFC. AR 493-94.

In its review of the ALJ's decision, the Court is guided by the principle that if it "finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F.Supp.2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). "Importantly, it is not a reviewing court's function 'to determine de novo whether a claimant is disabled.'" Mauro v. Berryhill, 270 F. Supp. 3d 754, 760 (S.D.N.Y. 2017) (quoting

Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998)). The Court's role here, therefore, is limited and subject to the "very deferential" standard of review to the Commissioner. Brault v. Soc. Sec. Admin., Com'r, 683 F.3d 443, 448 (2d Cir. 2012). The Court finds that the ALJ was sufficiently clear as to how he determined that Meyer's RFC did not include any limitations on his ability to sit or stand. Cichocki, 729 F.3d at 178 & n.3 ("An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record permits us to glean the rationale of an ALJ's decision.") (quotation marks omitted). Thus, the Court will not remand even if it might reach a different conclusion.

### B.    Subjective Complaints and Credibility

Meyer contends that the ALJ made three errors in discounting his credibility by: (1) overemphasizing the importance of Meyer's daily activities, (2) mischaracterizing Meyer's treatment history, and (3) misapplying the standard used for claimants with strong work records.

Meyer argues that the ALJ erred by misconstruing and overemphasizing certain of his reported daily activities. Specifically, he takes issue with the ALJ's discussion of his ability to occasionally cook, clean, and bathe himself. He also argues that certain parts of doctors' notes that describe Meyer's daily activities are inappropriately decontextualized. He further argues the ALJ inappropriately relied upon Meyer's testimony about driving to Virginia to determine his RFC, which is a medical assessment. There is some contradiction in the record regarding Meyer's self-reported functional limitations. But it is the purview of the ALJ, not the reviewing court, to resolve those discrepancies. And, as explained elsewhere in this opinion, the ALJ did not rely exclusively on Meyer's subjective complaints in determining his RFC but instead considered the medical evidence as well. The ALJ was entitled to reconcile discrepancies and then take Meyer's self-reported activities of daily living into account in determining his RFC.

Meyer also argues that the ALJ erred by characterizing his treatment as "routine and/or conservative in nature," which led him to view Meyer's symptoms as not credible. AR 23. Meyer points out that he underwent two surgeries, physical therapy, a steroid injection, chiropractic adjustments, acupuncture, a failed spinal cord stimulator, and has been on pain medication. He concedes that his pain management has been conservative since the November 2013 surgery, but maintains that it has not been effective either. But the ALJ's assessment of Meyer's course of treatment is based on record evidence, particularly Meyer's improvement over time. This demonstrates that Meyer's reported severity of his symptoms is not consistent with the medical reports. Further, the ALJ properly found that there was indication within the medical record itself that Meyer's symptoms are not entirely credible. His treating orthopedist, Dr. Jones, declined to perform a third surgery due to "red flags" related to Meyer's pending disability claim. AR 590. In other words, it is apparent from the record that at least one of Meyer's treating physicians also felt that his alleged symptoms could have been over exaggerated.[2]

Finally, Meyer argues that the ALJ erred in finding that his work record undermined his credibility, given that he spent his entire career on the same police force. The ALJ acknowledged that this record was "excellent" but questioned whether his inability to work at a sedentary position was voluntary. But this portion of the opinion simply indicates that while Meyer had an impressive work history, the ALJ found there to be substantial evidence showing that he could work in a sedentary capacity. The ALJ did not commit the error of viewing this work history as a factor weighing against Meyer's credibility.

---

[2] Falk v. Colvin, cited by Meyer, is inapposite. In Falk, the court found that there was no evidence regarding the claimant's ability to sit or stand other than his own reported symptoms, which the ALJ improperly discredited. Here, on the other hand, there are internal inconsistencies to resolve within Meyer's account and within the medical record.

### C. Treating Physician Rule

The treating physician rule "generally requires deference to the medical opinion of a claimant's treating physician." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). "In order to override the opinion of the treating physician, [the Court of Appeals for the Second Circuit has] held that the ALJ must explicitly consider, *inter alia*: (1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013). The ALJ is required to provide "good reasons for dismissing a treating source's opinion." Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998). But "[i]t is not necessary that the ALJ recite each factor explicitly, only that the decision reflects application of the substance of the rule." Martinez-Paulino v. Astrue, No. 11-CIV-5485 (RPP), 2012 WL 3564140, at *16 (S.D.N.Y. Aug. 20, 2012).

Meyer challenges the ALJ's decision to afford the opinions of treating physicians Dr. Perri and Dr. Jones less than controlling weight. He claims that the ALJ did not apply the rule's factors, and that if he had, he would have arrived at a different conclusion. Meyer argues that the ALJ improperly discounted Dr. Perri's opinion for receiving compensation for writing it and for relying on Meyer's subjective complaints. Meyer further contends that Dr. Perri's opinion is consistent with his own treatment notes and the broader medical record. The Commissioner responds that the ALJ was permitted to discount Dr. Perri's opinion for relying on Meyer's subjective complaints and for its inconsistency with his treatment notes and Meyer's daily activities.

The ALJ correctly applied the treating physician rule in discounting Dr. Perri's opinion. He acknowledged the length and frequency of Dr. Perri's treating relationship with Meyer by

citing record evidence from the duration of the time that he was treated. He also compared Dr.

Perri's opinion to the record, finding that it was inconsistent with objective evidence of

improvement and Meyer's reported daily activities. He also considered the evidence Dr. Perri

cites in formulating his opinion. Dr. Perri relied on objective testing and his own expertise as a

medical professional, but he also attached "significant weight" to Meyer's subjective reports. AR

740. In similar circumstances, courts have upheld an ALJ's finding that a treating source's

opinion was not due controlling weight. See, e.g., Lewis v. Colvin, 548 F. App'x 675, 678 (2d

Cir. 2013) (upholding an ALJ's finding that a treating source's "final opinion was inconsistent

with his own prior opinions and the findings of the other medical examiners, and was based on

[the claimant's] subjective complaints."); Maurice v. Colvin, No. 12-CIV-2114 (LGS), 2014 WL

5410004, at *4 (S.D.N.Y. Oct. 23, 2014) (adopting a Report and Recommendation that found

"that the opinions of the treating physicians were inconsistent with the objective medical

evidence, and were based largely on Plaintiff's own subjective complaints."). While the ALJ

failed to discuss whether Dr. Perri was a specialist, the Court finds this was harmless error

unlikely to have swayed the ALJ's decision to afford Dr. Perri less than controlling weight.

Nor did the ALJ err in determining that Dr. Jones's opinion was due less than controlling

weight, though part of his justification for doing so is erroneous. The ALJ questioned the

provenance of Dr. Jones's opinion because someone from his office declined to fill out a

subsequent supplemental questionnaire and because Dr. Jones's assessed limitations were largely

coextensive with Dr. Perri's. This led the ALJ to believe that the opinion was not truly signed by

Dr. Jones. But the ALJ could, and should, have developed the record by inquiring whether Dr.

Jones had filled out original report. His speculation about its origin is not an evidentiary basis for

disregarding the opinion of a treating physician. The ALJ also stated, however, that Dr. Jones's

opinion was inconsistent with his treatment notes, which generally showed improvement after Meyer's second surgery. AR 26. Similar to his evaluation of Dr. Perri, the ALJ's thorough review of the record (which indicates that he considered the length and frequency of their treating relationship) and his review of Dr. Jones's treatment notes demonstrate adequate application of the treating physician rule such that his additional comments about the authenticity of the opinion constitute harmless error.

## CONCLUSION

The Commissioner's motion is GRANTED and Plaintiff's motion is DENIED. The Clerk of the Court is respectfully requested to terminate the motions at ECF Nos. 25 and 30 and close this case.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

September 28, 2018
New York, New York